Kathleen J. KRALOWEC

v.

PRINCE GEORGE'S COUNTY, MARYLAND.

Civ. No. W–74–1384.

United States District Court, D. Maryland.

Nov. 17, 1980.

---

Harold Buchman, Baltimore, Md., for plaintiff.

James C. Chapin, County Atty., Michael O. Connaughton, Deputy County Atty., John R. Gober, Associate County Atty., Prince George's County, Upper Marlboro, Md., for defendant.

## MEMORANDUM OPINION

WATKINS, Senior District Judge.

### Introduction

Plaintiff, Kathleen J. Kralowec, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., alleging by an amended complaint that Prince George's County, Maryland (hereinafter the County), discrim-inated against her in her employment on the basis of her sex. Plaintiff charges that the County illegally denied her a promotion because of her sex and then terminated her employment in retaliation for her filing a complaint of employment discrimination with the County Attorney.

A trial de novo was held in April, 1978 on the merits of this case.[1] After a careful review of the entire record before the Court, judgment will be entered in favor of the defendant. This opinion will constitute the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52.

Plaintiff, an urban planner, was employed in the Model Cities Program of the County's Department of Human Resources and Community Development from September 1, 1969[2] until her termination on October 27, 1972. In November, 1971, Thomas Cassidy left the grade 30 position of Chief of Planning and Evaluation for the Model Cities Program to become acting Assistant Director for the Department of Human Resources and Community Development. Tr. 573.[3] In December, 1971, Libeuwa Gregory Odum was appointed to the position of Chief of Planning and Evaluation in an acting capacity. Plaintiff's Trial Exhibit 49a.

The County's Personnel Office posted an announcement of promotional opportunity regarding the permanent position of Chief of Planning and Evaluation in April, 1972. Only the acting incumbent, Odum, and plaintiff, who then held a grade 27 position, submitted applications for promotion to this permanent position. On May 22, 1972 Odum was appointed to this position. Plaintiff's Trial Exhibit 49b. The Assistant Director for the Model Cities Program, Obi S. Ogene, notified plaintiff of this decision by a letter dated June 6, 1972, citing Odum's "better administrative experience"

---

1. Post–trial briefing was ordered on several issues critical to a determination of this case. Significant difficulties were encountered in obtaining an official transcript following the completion of post–trial briefing.

2. Plaintiff was under contract to the Program prior to this time.

3. Citation to the trial transcript will be denoted as "Tr. __." Citation to the transcript from the two preliminary injunction hearings will be denoted as "P.I. Tr. __." Although two separate hearings were held, the transcript is paginated consecutively.

as the reason for the selection. Plaintiff's Trial Exhibit 10.

Pursuant to procedures specified in the County's Merit System Ordinance, plaintiff filed a complaint with the County Attorney, Walter H. Mahoney, on July 1, 1972 against both Obi S. Ogene and his superiors in the Department of Human Resources and Community Development under the "Prohibited Discrimination" clause, § 13–107. Plaintiff charged as follows:

I was recently (June 6, 1972) denied a promotion by Mr. Ogene in favor of a male, fellow countryman of Mr. Ogene's, who is not as well qualified for the position nor as specifically qualified for the position as myself.

I further charge, against Mr. Ogene, untoward harassment throughout our association as a result of prejudicial discrimination against me due to race, sex and national origin.[4]

The Prince George's County Personnel Department is held here as a contributory correspondent in the matter of sex discrimination.

Plaintiff's Trial Exhibit 11.

While the above–quoted complaint was pending, plaintiff directed a request by a memorandum dated September 12, 1972 to Clayton McDowell, Acting Director of the Office of Personnel, seeking a position audit of her position as Housing and Neighborhood Planner in order to accomplish the upgrading of that position from a grade 27 to a grade 30. Plaintiff's Trial Exhibit 35. This request was never acted upon, apparently because of subsequent events affecting plaintiff's employment status. Tr. 368.

On October 5, 1972 plaintiff testified before the County Attorney in support of her pending discrimination complaint. Tr. 369. On October 6, 1972 plaintiff received a memorandum dated October 2, 1972 from Obi S. Ogene, recommending her termination as of October 27, 1972. Tr. 369; De-

fendant's Trial Exhibit 4. The reasons cited for the proposed termination were insubordination and unsatisfactory performance, absence without leave, knowingly giving false statements to supervisor, violation of county ordinances, administrative regulations, and department rules, and consistently offensive conduct to superiors and other Model Cities members. Defendant's Trial Exhibit 4. The memorandum directed that plaintiff file her response to each charge by the close of business October 5, 1972 [one day prior to plaintiff's receipt of these charges] and promised notice of Ogene's final action by the close of business on October 6, 1972. *Id.* at 5.

By an October 12, 1972 memorandum to Clodus Smith, Director of the Department of Human Resources and Community Development, Ogene and others, plaintiff summarized her response to the charges made in Ogene's notice of termination and indicated that a more detailed reply would follow shortly. Plaintiff's full reply was sent to Obi S. Ogene by a memorandum dated October 26, 1972. In the interim, however, Ogene gave plaintiff final notice of her termination effective October 27, 1972. Defendant's Trial Exhibit 3 (dated October 13, 1972). The same memorandum notified plaintiff that she had five days to appeal this termination action.

On October 10, 1972 plaintiff supplemented her complaint filed with the County Attorney by adding an allegation of retaliatory firing. She also appealed her discharge to the Prince George's County Personnel Board. The Personnel Board convened to consider the appeal on November 13, 1972, but as the County Attorney had not yet reported his findings on plaintiff's complaint, the Personnel Board deferred action to await his decision. The Board directed that plaintiff be restored to pay in a non–duty administrative leave status, retroactive to October 27, 1972, noting that the Department of Human Resources and Com-

---

4. Although plaintiff's complaint filed with the County Attorney alleged discrimination on the basis of race and national origin as well as sex, plaintiff's second amended complaint in the instant action alleges only sex discrimination. Plaintiff's proof at trial is also directed only to a sex discrimination claim. Therefore only plaintiff's sex discrimination claims are before this Court.

munity Development could reconsider appropriate personnel action following the County Attorney's determination. Plaintiff's Trial Exhibit 17 at 2.

The County Attorney issued his decision on December 29, 1972. He found no discrimination against plaintiff in her failure to be promoted. He did, however, find fault with the procedures used to select Odum as Chief of Planning and Evaluation, and directed that Odum's appointment be revoked and the selection of the Chief be made by the Director of Human Resources and Community Development without consultation with Ogene. The County Attorney did not decide the retaliatory firing issue, leaving that determination to the Personnel Board. Plaintiff appealed the County Attorney's decision to the Personnel Board.[5]

By letter dated February 1, 1973, Ogene advised plaintiff that the original termination charges against her were reinstituted. She appealed this termination action on February 5, 1973. The Personnel Board, in 31 hearing sessions between May 16, 1973 and May 20, 1974, held a *de novo* trial on the discrimination complaint and also considered the dismissal issue. Plaintiff, Ogene, Odum, and the Department of Human Resources and Community Development were parties to the proceedings.

The Personnel Board issued its decision on November 15, 1974. Its findings on the promotion issue state, *inter alia* :

> [A]ctions of offensive conduct on behalf of Appellant Kralowec so cloud the issue of discrimination on the basis of sex as to prohibit a clear finding that the County's action was, indeed, the result of such discrimination and not an action unrelated to her sex but reflective of Appellant Kralowec's past behavior. The Personnel Board, therefore, concludes only that Appellant Kralowec *may have been* subject to elements of prohibited discrimination. However, the issue of discrimination on the basis of sex notwithstanding, the Per-

sonnel Board concludes that presented evidence failed to demonstrate that Appellant Kralowec possessed appropriate temperment [sic] and supervisory ability to have been selected for the subject position. The Board, therefore, could not find that had it not been for alleged discrimination, Appellant Kralowec would have been selected to fill the position of Chief, Planning and Evaluation, Model Cities Program.

Plaintiff's Trial Exhibit 17, at 22 (emphasis in original).

With respect to the dismissal, the Personnel Board concluded that "the termination action of Appellant Kralowec may be, in part, characterized as harassment and a retaliatory act resulting from the filing of a complaint of discrimination." Plaintiff's Trial Exhibit 17, at 30. The Board directed reinstatement of the plaintiff with full back pay, an official reprimand of plaintiff, forfeiture of 20 days annual leave, removal of Odum from the contested position, and re-advertising of the position with selection of the new Chief to be made by the Director of the Department of Human Resources and Community Development, priority consideration for plaintiff for the Chief of Planning and Evaluation position or any grade 30 vacancy for which she was qualified, and steps by the County to implement affirmative action.

The County refused to comply with the Personnel Board's directives and appealed the decision to the Circuit Court for Prince George's County, Maryland. That court, in an opinion issued October 15, 1975, reversed the Personnel Board. *Prince George's County, Maryland v. Kralowec,* Law No. 58,918 (P.G.Cty.Cir.Ct. October 15, 1975), Defendant's Exhibit No. 1. The circuit court determined that the Board was without power to consider *de novo* the discrimination complaint, and that the Board's jurisdiction was limited to a consideration of whether the County Attorney's decision was clearly erroneous. The circuit court found

---

**5.** Ogene, Odum, and Smith also appealed the decision of the County Attorney, although they

were not parties to that proceeding.

substantial basis for the County Attorney's determination of no discrimination and therefore reinstated that finding. Defendant's Trial Exhibit 1.[6]

As to the claim of retaliatory firing, the circuit court stated:

> Whether or not the other charges were dismissed, it is manifest that the charges sustained by the Board would be more than sufficient to satisfy a reasonable person beyond all doubt that the Personnel Officer was not in error in discharging the employee.
>
> The action of the Personnel Board in reinstating the employee was capricious and an abuse of discretion and accordingly should be reversed. The action of the Personnel Officer in terminating Kralowec's employment should stand.

*Id.* at 10.

The Court of Special Appeals affirmed the circuit court's decision, *Kralowec v. Prince George's County, Maryland,* No. 1121 (Ct.Spec.App. August 27, 1976) (Defendant's Exhibit No. 2). The Court of Appeals of Maryland and the United States Supreme Court denied certiorari. 278 Md. 726 (1976); 430 U.S. 973, 97 S.Ct. 1662, 52 L.Ed.2d 367 (1977). On June 1, 1973 plain-

tiff filed a complaint with the Equal Employment Opportunity Commission (EEOC), which issued a right to sue letter on September 23, 1974.

Plaintiff filed an action in this Court on December 18, 1974[7] and also moved for a preliminary injunction. This Court denied the motion for preliminary injunction following three days of hearings in February, 1975 during which extensive testimony was produced. Plaintiff later renewed her motion for a preliminary injunction. A second hearing was held in March, 1976, where the Court heard additional testimony and again refused to grant the injunction.[8] At the trial on the merits the parties stipulated that the testimony produced at the two hearings on the motion for a preliminary injunction would be incorporated into the trial record. Tr. 2–4.

### Collateral Estoppel Issue

Several issues relevant to this Court's determination of the instant case have already been considered by state and local administrative and judicial forums. This Court must therefore determine what effect the prior state and local proceedings should have on the instant suit.

---

**6.** At the time of plaintiff's original complaint, the incumbent County Attorney was Walter H. Mahoney. However, at the time of the circuit court's decision, this position was held by Joseph S. Casula. Casula attempted to withdraw the opinion of his predecessor to prevent its reinstatement. This Court was not advised of Casula's final action in this regard and expresses no opinion as to the effect of such an attempt to withdraw an opinion issued by a predecessor in office. The Court finds the issue irrelevant to a final determination in the case at bar as the opinion was not introduced into evidence in this case. The Court notes that it would be inclined to accord little weight to the opinion in any case because the opinion was reached without the benefit of adversarial procedure or formalized factfinding. *See* discussion *infra. Cf. Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

**7.** The Court finds that plaintiff exhausted her administrative remedies as required by Title VII, 42 U.S.C. § 2000e–5.

**8.** At this hearing plaintiff also moved to strike the testimony of Obi S. Ogene entirely from the previous preliminary injunction hearing. Plain-

tiff produced exhibits which indicated that Ogene had given false testimony concerning his academic credentials at the prior hearing. The Court denied the motion to strike Ogene's testimony, noting that the Fourth Circuit has strongly disapproved of the "falsus in uno, falsus in omnibus" approach to factfinding. *Virginia Railway Co. v. Armentrout,* 166 F.2d 400 (4 Cir. 1948). A factfinder is not barred from finding elements of both truth and untruth in a witness's testimony. *Champion Papers, Inc. (Ohio Division) v. N. L. R. B.,* 393 F.2d 388 (6 Cir. 1968); *United States v. Rutkin,* 189 F.2d 431, 434 (3 Cir. 1951), aff'd, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952); *Kennerly v. Aro, Inc.,* 447 F.Supp. 1083 (E.D.Tenn.1977). The Court as factfinder in this Title VII case had the duty to determine each witness's credibility. Plaintiff adduced further testimony on the issue of Ogene's credibility at trial. The Court has carefully considered this evidence in weighing Ogene's credibility, and in light of all the evidence, has rejected the testimony which it found to be false and accepted the testimony which it found to be true.

In *Batiste v. Furnco Construction Co.*, 503 F.2d 447 (7 Cir. 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975), plaintiffs brought a complaint before the Illinois Fair Employment Practices Commission, which dismissed the complaint. Then plaintiffs brought a Title VII claim in federal district court. The Seventh Circuit refused to apply the doctrine of election of remedies or res judicata to a Title VII action where a plaintiff had previously litigated his or her charges to final adjudication in a state proceeding. The Seventh Circuit stated:

> There is a strong Congressional policy that plaintiffs not be deprived of their right to resort to the federal courts for adjudication of their federal claims under Title VII.... It is also apparent that if federal actions are barred by the application of election of remedies and res judicata, then the statutory scheme of deferral to state proceedings will be frustrated by requiring that the plaintiff, who desired to bring an action in federal court, first commence state proceedings but abandon them quickly before an adjudication is made.
>
> ... It has been determined that the Congressional policies embodied in Title VII require that res judicata not be applied to state adjudications. *Cooper [v. Philip Morris, Inc.*, 464 F.2d 9 (6 Cir. 1972)]; *Voutsis v. Union Carbide Corporation*, 452 F.2d 889 (2d Cir. 1971) and *Young v. South Side Packing Company*, 369 F.Supp. 59 (E.D.Wis.1973).

503 F.2d at 450.

By its terms, the holding in *Batiste* applies to all prior state "adjudications." Although on its facts *Batiste* only applies to prior state administrative agency decisions, *Batiste* is not limited to its facts, either by the court itself or by subsequent case law. With a single exception, all of the federal courts which have considered the res judicata or collateral estoppel issue in Title VII cases have refused to apply those doctrines to prior state court opinions. *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8 Cir. 1980), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980);

*Smouse v. General Electric Co.*, 626 F.2d 333 (3 Cir. 1980) (*per curiam*); *Kremer v. Chemical Construction Corp.*, 464 F.Supp. 468 (S.D.N.Y.1978), *reconsidered and dismissed*, 477 F.Supp. 587 (S.D.N.Y.1979) (dismissal mandated by Second Circuit's subsequent decision in *Sinicropi v. Nassau County*, 601 F.2d 60 at 62 (2 Cir. 1979)), *dismissal aff'd*, 623 F.2d 786 (2 Cir. 1980) (*Sinicropi* applied retroactively); *Nickel v. Highway Industries, Inc.*, 441 F.Supp. 477 (W.D.Wis. 1977); *Gilinsky v. Columbia University*, 440 F.Supp. 1120 (S.D.N.Y.1977); *Al–Hamdani v. State University of New York*, 438 F.Supp. 299 (W.D.N.Y.1977); *Beck v. Mather*, 417 F.Supp. 648 (W.D.Va.1976); *Benneci v. Dept. of Labor*, 388 F.Supp. 1080 (S.D.N.Y.1975); *Young v. South Side Packing Co.*, 369 F.Supp. 59 (E.D.Wis.1973).

The lone exception to this line of authority is the Second Circuit's decision in *Sinicropi v. Nassau County*, 601 F.2d 60 (2 Cir. 1979) (*per curiam*), *cert. denied*, 449 U.S. 983, 100 S.Ct. 488, 62 L.Ed.2d 411 (1979). In *Sinicropi* the Second Circuit held that res judicata effect should be given to state court proceedings in subsequent Title VII actions. The Second Circuit relied on its previous decision in *Mitchell v. National Broadcasting Co.*, 553 F.2d 265 (2 Cir. 1977), in which it held that res judicata effect must be given to state court proceedings in a federal discrimination action brought under 42 U.S.C. § 1981. In a *per curiam* opinion, the *Sinicropi* court perfunctorily stated that it saw "no reason to distinguish between section 1981 and Title VII for res judicata purposes." 601 F.2d at 62.

The Eighth Circuit strongly disputed the *Sinicropi* court's conclusion. *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8 Cir. 1980). In *Gunther* the Eighth Circuit stated:

> [T]here are several bases for distinguishing between Section 1981 and Title VII with regard to the application of res judicata....
>
> ... [T]he unique statutory scheme of Title VII supports the proposition that res judicata and collateral estoppel should

not be applied. Title VII's requirement of first, deferring to state remedies, 42 U.S.C. § 2000e–5(c), would be frustrated by applying a bar to federal actions because a state court had decided on appeal from a state agency decision. *Batiste v. Furnco Constr. Co., supra*, 503 F.2d at 450. Further, unlike other civil rights statutes, Title VII clearly provides for a *de novo* hearing in federal court. *Chandler v. Roudebush*, 425 U.S. 840, 844–45, 96 S.Ct. 1949, 1951–1952, 48 L.Ed.2d 416 (1976). The language of Title VII does not indicate Congress intended to limit this provision by giving res judicata or collateral estoppel effect to state proceedings and we would have reservations in judicially creating such a limitation. *See Benneci v. Department of Labor*, 388 F.Supp.,1080, 1082 (S.D.N.Y.1975).

*Gunther*, 612 F.2d at 1084 n.6.[9]

While thus questioning the holding in *Sinicropi*, the Eighth Circuit in *Gunther* did not decide the precise question before the *Sinicropi* court. In *Sinicropi* the *plaintiff* had appealed the state administrative decision to the state court system. The Second Circuit's holding on the res judicata effect of state court decisions was limited to that situation. In *Gunther*, the plaintiff had won at the state administrative level and appeared in state court proceedings only to respond to defendant's appeal. The Eighth Circuit in *Gunther* based its decision on this distinction between *Sinicropi* and the case before it, holding that no res judicata effect

would be accorded where the plaintiff did not seek state court review, but was forced to defend by appellant's appeal. 612 F.2d at 1083.

In the case at bar, plaintiff herself appealed the Personnel Board's decision to the state court.[10] Therefore, this Court is squarely confronted with the question of whether to follow the Second Circuit's *per curiam* opinion in *Sinicropi*, and thus to give res judicata effect to the state court decisions here in issue. This Court declines to do so. As the discussions in both the *Batiste* and *Gunther* decisions aptly demonstrate, such a decision would frustrate the policies underlying the Title VII statutory scheme. *Gunther*, 612 F.2d at 1084 n.6; *Batiste*, 503 F.2d at 450. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974). In the absence of guidance from the Supreme Court or the Fourth Circuit, this Court will follow the better–reasoned authority exemplified by *Batiste* and *Gunther*.

Although this Court does not accord the state court decisions res judicata or collateral estoppel effect, this Court is permitted to consider the record of the state administrative or court proceedings as evidence in the federal suit. *Smouse*, 626 F.2d at 335; *Gilinsky*, 440 F.Supp. at 1122. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974). In *Alexander*, the Supreme Court held that, while labor arbitration does not bar a *de*

---

9. As the Eighth Circuit notes in *Gunther*, several district courts which decided cases after *Mitchell* and before *Sinicropi* had found that the Second Circuit's holding in *Mitchell* did not control the application of res judicata to Title VII actions. *Gavin v. Peoples Natural Gas*, 464 F.Supp. 622, 624–26 (W.D.Penn.1979), *vacated on other grounds*, 613 F.2d 482 (3 Cir. 1980); *Kremer v. Chemical Constr. Co.*, 464 F.Supp. 468, 470–74 (S.D.N.Y.1978), *reconsidered and dismissed*, 477 F.Supp. 587 (S.D.N.Y.1979) (under subsequent authority of *Sinicropi*), *dismissal aff'd*, 623 F.2d 786 (2 Cir. 1980) (*Sinicropi* retroactively applied); *Nickel v. Highway Indus., Inc.*, 441 F.Supp. 477, 479 (W.D.Wis. 1977); *Gilinsky v. Columbia Univ.*, 440 F.Supp. 1120, 1121–22 (S.D.N.Y.1977); *Al–Hamdani v. State University of New York*, 438 F.Supp. 299, 301–303 (W.D.N.Y.1977).

10. The Personnel Board is a local administrative body within the Prince George's County government. Although much of the authority regarding collateral estoppel effect relates to decisions by state rather than local administrative agencies, the Court does not find a distinction between state and local administrative agencies to be significant. Under the statutory framework, decisions by the Personnel Board were appealable to the pertinent circuit court, the state court of general jurisdiction. This is similar to the situation in *Batiste*, where the decision by the Illinois Fair Employment Commission was appealed through the state court system. 503 F.2d at 449. The Court applies the reasoning of *Batiste* and *Gunther* to the procedural framework raised by the facts of the case at bar.

*novo* trial of an employment discrimination claim in federal court, the "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander*, 415 U.S. at 60, 94 S.Ct. at 1025. This Court is mindful of the tremendous judicial resources already expended in this case and further appreciates the Personnel Board's greater expertise in interpreting the County's policies and practices. Therefore, in reaching a *de novo* determination of the issues raised in this case, this Court will consider as evidence the prior state and local administrative and judicial decisions.[11]

### The Failure To Promote

■ Plaintiff alleges that defendant failed to promote her because of her sex in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1).[12] A plaintiff may proceed under two alternative theories in presenting a case under this statute, "disparate treatment" or "disparate impact."

The "disparate treatment" approach covers a factual situation where "[t]he employer simply treats some people less favorably than others because of their race, sex, color, religion or national origin." *Wright v. National Archives and Records Service*, 609 F.2d 702, 711 (4 Cir. 1979) (*en banc*), quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977). In contrast, the "disparate impact" approach "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.*

Plaintiff here does not complain of a facially neutral employment practice which has a disproportionately adverse effect upon employees of her sex. Instead the gravamen of her complaint is that discrete adverse actions were taken with regard to her own employment because of her sex.[13] Therefore, this Court concludes that plaintiff here did not advance a case under the disparate impact theory and the Court will analyze plaintiff's claims under the case law governing the disparate treatment approach. *See Wright*, 609 F.2d at 711–13.

11. The Court must determine what weight to give to each of the prior state and local administrative and judicial opinions. The Supreme Court provided guidance on this issue in *Alexander v. Gardner–Denver Co.* There the Supreme Court stated that the weight of an arbitral decision is to be determined in the court's discretion with regard to the facts and circumstances of each case. 415 U.S. at 60 n.21, 94 S.Ct. at 1025 n.21. The Supreme Court suggested several factors important to this determination. Those relevant to this Court's decision are the degree of procedural fairness in the forum and the adequacy of the record with respect to the issue of discrimination. *Id.* The Supreme Court emphasized that the weight should be related to the similarity of the issues in the arbitral forum to those in the Title VII case, and that the weight should be greater where pure issues of fact were involved.

The Personnel Board was the only forum which conducted full–blown factual hearings on plaintiff's discrimination claims. Consequently, this Court accords significant weight to the Board's findings which are relevant to the issues in the case at bar. However, the Court grants weight to these findings only to the extent that they were not reversed or discredited by the circuit court's decision. As noted *supra*, the circuit court reversed the Per-

sonnel Board on jurisdictional grounds and disagreed with certain of the Board's ultimate conclusions, while affirming several underlying factual findings. *See also* discussion *supra* at n.6.

12. Title VII's provisions became applicable to municipal corporations such as defendant on March 24, 1972. The failure to promote at issue here occurred after this date. This dispute is therefore properly governed by Title VII.

13. Although evidence was admitted concerning the general status of women in defendant's employ, this evidence was not introduced for the purpose of proving the effect of any facially neutral policy, but rather in order to show a general discriminatory attitude on the part of defendant. Such evidence is clearly appropriate in a disparate treatment case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) (pretext in disparate treatment case may be shown by reference to employer's general policy and practice with respect to minority employment, including use of statistical evidence showing conformity with a general pattern of discrimination).

■ As noted earlier, under the disparate treatment theory a violation will be found where an employer treats some people less favorably than others because of their sex. Under this theory "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters*, 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15. In such a case plaintiff has the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

If the plaintiff carries this initial burden, the employer has the burden of going forward with evidence of some legitimate, nondiscriminatory reason for the action. *Id.* at 578, 98 S.Ct. at 2950. Plaintiff then has the burden of proving "that the proffered justification is merely a pretext for discrimination." *Id.; Wright*, 609 F.2d at 714. The risk of nonpersuasion, however, does not shift. It remains on plaintiff throughout the case. *See Wright*, 609 F.2d at 714 n.13; *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

In *McDonnell Douglas*, the Supreme Court set forth a framework for analyzing whether a plaintiff had established his or her prima facie case, requiring that the plaintiff show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[14]

*Id.* at 802, 93 S.Ct. at 1824. This test is to be flexibly applied to the facts in a particular case. It has been applied to govern promotion decisions such as the case at bar. *Wright*, 609 F.2d at 714; *Davis v. Litton Bionetics, Inc.*, 444 F.Supp. 638, 639–40 n.3 (D.Md.1978).

■ In order to establish a prima facie case and thereby create an inference of discrimination here, plaintiff here had to show that she belongs to a protected class, that she applied and was qualified for a job for which her employer was seeking applications, that despite her qualifications she was rejected, and that the promotion was available to others of her qualifications. *See Wright*, 609 F.2d at 714. Plaintiff could, of course, also sustain this burden by introducing direct evidence tending to show discriminatory motive on the part of defendant. *See Teamsters*, 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15.

Plaintiff, a female, is clearly a member of a class protected under the statute. In April, 1972 she applied for promotion pursuant to an announcement of promotional opportunity posted by the Office of Personnel.[15] Another applicant, L. Gregory Odum,

14. Counsel for defendant argues in its post–trial brief that plaintiff's case must fail under the *McDonnell Douglas* standard because Odum, a black, and therefore a member of a minority group, received the subject promotion. This argument misconceives the purpose of Title VII. The obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race or sex. *See Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949. Members of protected groups are not interchangeable; thus the employment of a black person has no bearing on an allegation of sex discrimination. The relevant consideration in this context is not that Odum is black, but that he is male. In the rebuttal argument supporting defendant's motion to dismiss, counsel for defendant argues

that this puts defendant in an untenable position because, in its view, if plaintiff had been promoted in Odum's stead, Odum could have claimed racial discrimination. Tr. 531. Although it is always possible that an employee will file such a complaint, the Court notes that liability only lies under the statute where, after a plaintiff has made a prima facie case, a defendant is unable to advance a non–pretextual, legitimate, non–discriminatory reason for its employment actions. This hardly leaves defendant in the awkward position it seems to envision.

15. Plaintiff contends that the placement of this announcement of promotional opportunity on a bulletin board far removed from her office was

received the subject appointment on May 22, 1972. Plaintiff was notified of her rejection by a June 6, 1972 letter. Therefore, the only question as to whether plaintiff established a prima facie case centers on the question of whether she was qualified for the grade 30 position of Chief of Planning and Evaluation.

The announcement of promotional opportunity set forth the qualification requirements as follows:

> Graduation from a college or university with a master's degree in the field or urban or social planning and analysis or other related fields, plus adequate experience in one or more aspects of urban planning and/or program design and evaluation. An equivalent combination of training and experience may be substituted for the stated academic requirement. Applicants must be Merit System employees.

Plaintiff's Trial Exhibit 7.

Plaintiff has a B.A. in pre–planning (1956) and a master of arts in urban planning (1957) from the University of Washington. The application for the position of Chief of Planning and Evaluation indicates that she devoted the majority of her time between 1956 and her termination from the Model Cities Program in 1972 to employment in the planning field.[16]

Under the selection process employed by defendant during the relevant time period, a personnel analyst from the Office of Personnel rated the applications submitted for posted promotional opportunities according to the formal qualification requirements stated in the announcement. *See* Tr. 192; P.I. Tr. 332. Lucille Johnson, the personnel analyst who rated the applications for the position in question, rated plaintiff as "well–qualified" on the basis of the above information. Tr. 170. Although Johnson testified that her supervisor, H. Roberson, disagreed with this rating, plaintiff's application was initialed by both Roberson and Johnson, and was certified to division head Ogene with this "well–qualified" rating unchanged. Tr. 168, 191; Plaintiff's Trial Exhibit 41.

Plaintiff clearly met the stated formal qualifications. Her application then went to Ogene for consideration along with that of Odum. Under the Merit System Ordinance Ogene as division head had the duty to make the final selection. Tr. 192; Merit System Ordinance §§ 13–64, 13–65 (Plaintiff's Trial Exhibit 18). This final evaluation by the division or department head was to determine the candidate best suited for the particular job, and this determination would naturally require consideration of factors not resolved by the formal qualifications.

The position description posted with the announcement of promotional opportunity stated as follows:

> Planner, New Jersey Division of State and Regional Planning, Trenton, New Jersey; September, 1962 to July, 1963, Chief Planner, Community Renewal Program, Newark Housing Authority; July, 1963 to July, 1964, Consultant, O. Wayne Noble Associates, Paterson, New Jersey; July, 1964 to March, 1965, Planning Director, Department of Planning and Development, Bloomfield, New Jersey; March, 1965 to March, 1966, Consultant, Doxiadis Associates, Inc., Washington, D.C.; December, 1966 to June, 1967, Community Shelter Plan Officer (temporary), D.C. Office of Civil Defense, Washington, D.C.; August, 1969 to October, 1972, Project Coordinator, Conductor for Resident Employment Center and Housing and Neighborhood Planner, Department of Human Resources and Community Development, Model Cities Program, Prince George's County, Maryland.

discriminatory or evidence of discriminatory intent. However, the evidence presented on this issue does no more than suggest that this notice was inconspicuously placed. Tr. 362, 467. There is no indication that it was any more difficult for plaintiff to find this notice than it was for anyone else, including male employees. *Id.*

16. The record indicates that plaintiff has been employed in the following capacities: June, 1956 to September, 1956, Intern Planner, Bellingham City Planning Commission, Bellingham, Washington; December, 1956 to January, 1957, Planning Assistant, Pierce County Planning Commission, Tacoma, Washington; August, 1957 to November, 1958, Assistant Planner, Tacoma City Planning Commission, Tacoma, Washington; December, 1958 to February, 1961, Senior Planner, Minneapolis City Planning Commission, Minneapolis, Minnesota; September, 1961 to September 1962, Principal

Incumbent will direct the overall planning programs in each of the Model Cities component areas and conduct meetings with federal, state, and county administrative officials concerning planning. Also, position includes supervision of work of staff planners and other personnel engaged in research and evaluation. Plaintiff's Trial Exhibit 7. The job thus entailed both the direction of the Model Cities Program's efforts and the supervision of subordinates. Defendant properly considered supervisory ability and the ability to direct a large program's efforts as further qualifications beyond the formal requirements stated on the announcement.[17]

In attempting to rebut plaintiff's prima facie case, defendant contends that plaintiff entirely lacked supervisory experience or the ability to supervise, and that she was, therefore, unqualified for the position in question. At this prima facie stage of plaintiff's case, the Court is of the view that plaintiff had only the burden of producing evidence to show that she was qualified for promotion because she had demonstrated some supervisory experience or ability. While the record establishes that plaintiff had no more than minimal supervisory experience,[18] defendant clearly did not consider such experience *per se* to be an unalterable prerequisite to the job. Thus Odum, plaintiff's competitor, was recommended for appointment to this position in an acting capacity even though the recommending official, Thomas Cassidy, knew that Odum had no supervisory experience while in the Model Cities Program. Tr. 592. Plaintiff produced evidence tending to show that she had demonstrated some supervisory capacity in the course of performing her responsibilities in the Model Cities Program. Plaintiff's duties involved coordination with outside consultants and with other government agencies. P.I. Tr. 32; Tr. 133, 207, 495. In addition, Gerald Gettleman, Ruth Brown, and Sylvester Vaughns, all of whom worked closely with plaintiff on Model Neighborhood Action Board (hereinafter referred to as MNAB) matters during her tenure in the Model Cities Program, thought that plaintiff had the capacity to supervise. Tr. 133, 147, 207.

---

17. Plaintiff appears to contend that the appointing officials' consideration of the applicants' qualifications should properly have been limited to those stated in the formal "qualifications requirements." The Merit System Ordinance sections governing selection provide that the personnel officer shall certify "to the appointing official . . . sufficient names to enable [the appointing official] to consider three eligibles for each vacancy." Although here only two names were certified to the selecting official, plaintiff does not claim that this irregularity was discriminatory, nor does the Court find this breach of the ordinance to be significant to the failure to select plaintiff. In any case, the personnel office complied with the other procedures set forth in this section. Under this process the personnel officer has already rated the applicants according to the posted qualification requirements at the time the names are certified to the appointing official. The Court is at a loss to understand what purpose an identical evaluation by the appointing official would serve. Rather, the Court concludes that the final consideration of the applicants was intended to inquire beyond the formal requirements in order to select the *best* "formally qualified" applicant for the particular job. In this deeper inquiry, the appointing officer could properly identify the duties associated with the job in question and consider whether each applicant had the necessary attributes to perform those duties.

18. There is some evidence that plaintiff "supervised" architects and other consultants. P.I. Tr. 32; Tr. 207, 495. These professionals were not assigned to plaintiff in the Model Cities chain of command. It is unclear from the record what this supervision of outside consultants entailed. *See* Tr. 207, 133. One of the Model Neighborhood Action Board members also testified that she had observed plaintiff supervising secretaries in the Model Cities offices. Tr. 133. However, plaintiff had no staff assigned to her and the secretaries were actually under the supervision of an administrative assistant to Assistant Director Ogene. P.I. Tr. 215.

The Court notes that defendant produced a great amount of evidence contesting plaintiff's ability to supervise. However, none of this evidence contradicts the facts set forth in the text below. Defendant's evidence goes to a comparison of the supervisory ability of the two applicants. Such evidence is more appropriately considered in evaluating the reasons advanced by defendant for the failure to promote plaintiff. *See Dual v. Griffin*, 446 F.Supp. 791, 796 (D.D.C.1977). Accordingly, such evidence is considered *infra*.

The Court finds that plaintiff produced sufficient evidence to show that she had demonstrated some capacity to supervise while performing her duties in the Model Cities Program. Evidence in the record does not clearly establish that plaintiff had demonstrated such capacity to supervise to the selecting officer, Ogene. Plaintiff's work with the MNAB was for the most part done outside of the Model Cities office. Obviously, if Ogene had no reason to know of plaintiff's supervisory capacity, he would not have been able to conclude that plaintiff was in fact qualified for the position. However the evidence of the stormy relationship between Ogene and plaintiff so clouds this issue as to render it virtually incapable of final resolution. The determination of this issue becomes unnecessary in light of this Court's resolution of other issues in this case. For the purposes of considering plaintiff's prima facie case, the Court assumes that Ogene did have reason to know that plaintiff had demonstrated some supervisory capacity in the course of her duties in the Model Cities Program. The Court therefore finds that plaintiff established a prima facie case of discrimination, shifting the burden to the defendant to come forward with legitimate, nondiscriminatory reasons for its failure to promote plaintiff.

Defendant advanced as its reason for its decision to select Odum over plaintiff that Odum was simply better qualified than plaintiff for the position in question. Plaintiff argues in response that Odum was in fact not even qualified according to the posted qualification requirements. The Court considers plaintiff's initial contention in some detail.

Odum's education includes training in law and economics, but no formal training in planning. P.I. Tr. 242–3; Plaintiff's Trial Exhibit 42. Odum's planning experience is limited to that gained from his employment in the Model Cities Program beginning in April, 1971. Odum's work experience prior to his employment with the Model Cities Program had been for the most part in various positions in the Nigerian Foreign Service. Odum joined the Model Cities Program in April, 1971 as an economic development planner, serving under the Chief of Planning and Evaluation, Thomas Cassidy. P.I. Tr. 246–47. In December, 1971 Odum was appointed to fill the Chief of Planning and Evaluation position in an acting capacity.

Odum's educational background does not precisely meet the formal qualification requirements set forth in the promotional announcement. *See* Plaintiff's Trial Exhibit 7. However, the announcement provides for such an eventuality, stating that "[a]n equivalent combination of training and experience may be substituted for the stated academic requirement." *Id.* In accordance with the defendant's selection process, the Office of Personnel was responsible for rating each applicant in terms of the requirements set forth in the announcement. Merit System Ordinance, § 13–65. The lowest rating which Odum received was "qualified." Tr. 168–70. Lucille Johnson, the personnel analyst who rated Odum's application, thus found that Odum's combined education and experience met the required formal qualifications. Johnson's supervisor in fact raised Odum's rating to "well–qualified." [19] Odum's and plaintiff's applications

19. Johnson's supervisor, H. Roberson, had the authority to change the ratings given by a personnel analyst. The reason for Roberson's disagreement with the "qualified" rating which Johnson gave Odum is not explained by any evidence in the record. Although Johnson testified that in her opinion Roberson "would traditionally or whatever, go with a man you know, getting an elevation more so than a woman," Tr. 170, Johnson offered absolutely no basis for this opinion and the Court must for that reason disregard her statement. Plaintiff offered no evidence other than Johnson's un-

supported opinion to suggest that Roberson's change in Odum's rating was in any way out of the ordinary, let alone improperly motivated. There is also evidence in the record to suggest that Johnson did not consider Odum's twelve months of planning experience with the Model Cities Program in arriving at his rating, Tr. 170, and it is possible that Roberson changed Odum's rating to take into account this pertinent experience. In any case, absent evidence of improper motivation, the Court must defer to the expertise of the Office of Personnel in

consequently carried identical ratings from the Office of Personnel when they were certified to Ogene for further consideration.

As earlier discussion has indicated, the department or division head had the duty to choose the best candidate for the particular job from those applicants certified for his consideration. The position description provided that an incumbent would be required to direct the Model Cities planning programs and to supervise the work of staff planners and other personnel. The responsibilities of the position did not require a pure planner, but rather a person with some planning background who would be able to perform various administrative and supervisory duties and to work with all members of the program to achieve program goals.[20]

Ogene testified that he found, and defendant contends here, that Odum was better qualified than plaintiff to perform these duties. Odum had demonstrated that he possessed many attributes important to success in carrying out the responsibilities of the position. Thus, in the letter which notified plaintiff of another's selection, Ogene cited the selectee's better administrative experience. P.I. Tr. 184–85. Defendant introduced significant evidence demonstrating Odum's prior administrative experience. Odum's responsibilities as an executive officer in the Consular and Treaties Division of the Nigerian Foreign Service included coordination of the editing, transcription, and overnight printing of all publications from international conferences to ensure their distribution to conference members the fol-

lowing day. P.I. Tr. 244. In that position Odum also supervised five clerical workers. *Id.*

Odum also served as economic secretary to the Nigerian Embassy in Washington, D.C. He was responsible for the work of the commercial attaches to the Nigerian Consulate General in New York and also acted as liaison to such international organizations as the World Bank, the International Monetary Fund and the Agency for International Development. He also handled various assignments from the Nigerian Government, coordinating activity with agencies that had a bearing on the assignment, and evaluating the final product of the assignment. P.I. Tr. 246.

Finally, Cassidy testified that while Odum was an economic development planner under Cassidy:

> Odum had been developing a whole work plan, looking down the whole future year, indicating tasks, timing, responsibilities, products, both for the Model Cities planning as well as for the overall program and project evaluation.

Tr. 592. Thus, Odum's previous responsibilities had given him the opportunity to direct and administer the broad efforts of various programs. Odum also had served four months in an acting capacity in the actual position in question and had therefore had this additional administrative and supervisory experience.[21]

In comparison with Odum's prior administrative experience, plaintiff has intro-

---

this matter, and therefore credits the final rating of "well–qualified" given to Odum.

**20.** Ogene estimated the responsibilities of the position to be 50% supervision, 25% planning, and 25% evaluation. P.I. Tr. 118. He stated that the job required a generalist who had capabilities in evaluation and methodology and who also had writing ability. P.I. Tr. 122.

Ogene's opinions as to the position's demands are borne out by a review of the background and experience of the past incumbent, Thomas Cassidy. Cassidy served as Chief of Planning and Evaluation from November, 1970 until November, 1971; he had also served in the position in an acting capacity from December, 1969 until September, 1970. Tr. 562, 568, 573. Cassidy was not a planner. He held a B.A. and a master's degree in government and

public administration and he had attended law school for one and a half years. Tr. 583. Prior to coming to the Model Cities Program in 1969 Cassidy had been the city manager for Seat Pleasant. P.I. Tr. 427. Cassidy was sophisticated politically and well able to deal with various groups. *Id.* Cassidy was promoted from the position of Chief of Planning to a position as Assistant Director of the Division. It is likely that his credentials would provide guidance in the selection of his successor.

**21.** Plaintiff argues that defendant's practice of appointing acting chiefs constituted a discriminatory practice under Title VII. Plaintiff argues initially that this practice was illegal under the Merit System Ordinance. It appears that no provision of the Merit System Ordinance expressly authorized the acting appoint-

duced evidence which supports a finding that she has had significant responsibility, but little administrative experience. She worked on several large funding proposals for federal grants, and in aid of such

ment in Odum's case. Section 13–68 of the ordinance provided for temporary appointments for short–term employment in positions which will not continue for more than six months in any twelve month period, and Odum's tenure as Acting Chief was slightly less than that maximum. However, Odum's employment with the County was apparently not of a short–term nature as envisioned by this section, because Odum had been employed in another capacity prior to his elevation to Acting Chief.

Section 13–69 also does not appear applicable. This section permits the County Commissioners or other appointing authority to appoint any qualified person to fill a position in order to prevent stoppage of public business or loss or serious inconvenience to the public where an emergency makes it impossible to fill the position under the normal competitive procedures. However, such an appointee can be employed only during the emergency and only for a period not exceeding 30 days per year, a time limit far exceeded by Odum in his capacity as Acting Chief.

The Personnel Board found:

> that the Prince George's County Merit System Ordinance does not authorize temporary promotions of the nature executed in the case of Mr. Odum. Indeed, his promotion and designation as Acting Chief of Planning and Evaluation, Model Cities Program, violated all precepts of merit system competitive placement in that it not only provided for promotion outside the provisions of the Merit System Ordinance but, as a potential candidate for permanent selection, placed Mr. Odum at a distinct competitive advantage over all other candidates.

Plaintiff's Exhibit No. 17, at 41.

Although the Circuit Court for Prince George's County reversed the Personnel Board's order removing Odum from the position in question on the ground that the Board had exceeded its authority in deciding the appeal when Odum had not been a party to the proceedings before the County Attorney, it did not call into question the Board's findings regarding the County's failure to comply with its own ordinances. After a review of the record this Court agrees with the Personnel Board's finding that the County acted without authority under its Merit System Ordinance in appointing Odum to the position of Acting Chief.

Nevertheless, plaintiff failed to show that Odum's appointment as Acting Chief was part

projects she "coordinated" with outside consultants such as architects and engineers as well as with various agencies. Tr. 207. As has been noted earlier, it is not at all clear what this "coordination" entailed. *Id.; see*

of a practice which discriminated against her on the basis of her sex. Judge Gasch of the District of Columbia District considered a similar problem in *Dual v. Griffin*, 446 F.Supp. 791, 796–97 (D.D.C.1977). In that case, the plaintiff claimed that he was refused a promotion because of racial discrimination, pointing out that the successful applicant, a white male, was temporarily detailed to the position prior to formal competition for the position in violation of Civil Service regulations. The plaintiff also pointed out that each of the men temporarily detailed as supervisors to the other four new staff elements were white and that each was finally selected for the permanent position.

Judge Gasch found that the successful applicant was better qualified than the plaintiff. The Court agreed that the plaintiff had been placed at a competitive disadvantage to the successful applicant by the illegal detail, but found that plaintiff had not shown that the illegal practice discriminated against him on racial grounds. The Court pointed out that the plaintiff did not show that any of the potential or actual competitors for the other supervisory positions were black, and that he thus failed to show a discriminatory practice. The Court therefore refused to find that the irregularity complained of constituted a Title VII violation.

Plaintiff here made a showing similar to that of the plaintiff in *Dual*. Testimony in this case established that from December, 1970 to October, 1972 three males were appointed to positions as acting chief, while no females received such appointments, and further that only one of the three males failed to receive the permanent appointment. P.I. Tr. 170–71. Plaintiff did not demonstrate, however, whether any of the potential or actual competitors for the other positions filled by "acting chiefs" were women. Thus, the Court concludes that plaintiff did not present any evidence which would permit this Court to view the irregularity represented by defendant's practice as a Title VII violation. *See* 446 F.Supp. at 797. The Court notes that, like the selected applicant in *Dual*, here Odum was more qualified than plaintiff even without the experience gained in the position in question. *See* discussion *infra*.

The Court also notes that this case is clearly different from the factual context confronted in *Page v. Bolger*, 21 E.P.D. ¶30,500 (4 Cir. 1979), where the Fourth Circuit held that the failure to follow agency procedures which were established expressly to prevent discriminatory promotion constituted a Title VII violation.

n.18 *supra.* Plaintiff's duties also required that she work closely with the MNAB. In that function she often acted as a liaison to various government agencies. Tr. 199. In 1971 she represented the MNAB's position in negotiations with the National Capital Park and Planning Commission regarding a memorandum of understanding for the Master Plan to be implemented in the area with HUD funds. There is, however, no evidence in the record to indicate that plaintiff orchestrated other persons' efforts on any large scale project. Plaintiff represented that while she was a housing and neighborhood planner she had supervised a task force composed of Model Cities staff who held higher grades than she assigned to her for these major grant efforts. P.I. Tr. 32. However, memoranda from Bill Walsh and Sandy Cherry to plaintiff and a memorandum from plaintiff to Rolanda Blier suggest only that these individuals, with grades equal to or higher than plaintiff's, provided plaintiff with information on one of her projects. Attachments to Plaintiff's Trial Exhibit 35. In addition, all of plaintiff's supervisors in the Model Cities Program testified that she had not exercised any supervisory role in the Model Cities Program.

The record in fact indicates that plaintiff's responsibilities rarely required that she work with other staff, and it appears that she most often worked independently of other Model Cities staff both on funding efforts and on planning projects in her area of expertise. *See,* P.I. Tr. 208; Tr. 66, 210–11, 218, 281, 286, 513. Thus, although plaintiff certainly worked on major projects critical to the success of the Model Cities Program, the evidence does not show that she had any particular experience in the administration or the direction of a group's efforts. The Court finds that Odum's administrative experience was in this way superior to plaintiff's and that Odum's advan-

tage in this regard would be significant in any consideration of the likely performance of each individual in the position in question.

Defendant also introduced evidence to show that plaintiff had had significant difficulties in maintaining good relationships with her superiors in the Model Cities Program. *See, e. g.,* P.I. Tr. 77; Tr. 580. The position in question required significant contact between the chief and his or her superiors. Defendant therefore considered plaintiff's apparent inability to get along with her present superiors as a further legitimate, nondiscriminatory reason for her non–selection.

The evidence on this issue pervades the record. Yvonne Tyler, administrative assistant to Ogene from July, 1971 through the time of plaintiff's termination, observed that plaintiff did not get along with any of her superiors during that period. Testimony indicated that Cassidy complained as early as June, 1970 that plaintiff refused to accept his assignments and instead set her own work priorities. P.I. Tr. 69–70, 77; Defendant's Trial Exhibit 4 (attachment dated June 3, 1970). This problem continued while plaintiff worked under both Mock and Odum and both of these supervisors complained to Ogene. P.I. Tr. 108, 208, 253; Tr. 48–51.[22] Mock explained at trial that plaintiff's difficulties with supervisors resulted from her inability to get along with "management." Tr. 51.

Confusion in the chain of command relevant to plaintiff's duties undoubtedly contributed to this problem after January, 1971. *See, e. g.,* Tr. 14. A budgetary error had inadvertently resulted in the elimination of plaintiff's physical planner position after December, 1970.[23] Plaintiff proved unwilling to compromise on the scope or content of her assignments in this difficult

---

**22.** Mock complained by way of two memos written in early 1971. On the witness stand Mock explained that he had written these memos to curry favor with Ogene, who seemed to want reports on those employees not considered to be "team players." Tr. 49. However, Mock refused to characterize his com-

plaints as lies and only apologized for the motive behind the memos. Tr. 51.

**23.** Because of this error, plaintiff was placed in an available slot designated for a project coordinator under Chief of Operations Mock.

situation. Cassidy, Mock, and Odum all experienced plaintiff's refusal to accept their assignments because she was on "special assignment." P.I. Tr. 70, 77, 108, 253. *See* Defendant's Trial Exhibit 4 (attachments). The record establishes that plaintiff did often receive priority assignments outside the normal chain of command from the director of the program or his assistant. *See, e. g.,* Tr. 15, 56. However, defendant adduced testimony which showed that plaintiff's continued refusal to accept supervision resulted primarily from her own abrasive manner and sense of self–importance. *See, e. g.,* P.I. 208, Tr. 406–07. Her attitude exacerbated the inevitable misunderstandings resulting from this organizational problem. *See, e. g.,* Tr. 460. The evidence indicates that plaintiff contributed significantly to her difficulties in getting along both in the organizational structure, and more particularly, with her superiors.[24]

Defendant also introduced some evidence to show that plaintiff had difficulties working with her peers and subordinates.

Yvonne Tyler recounted an incident in which she observed plaintiff confronting James Farmer, a peer, about Farmer's messy desk, a complaint which generated a loud argument disrupting normal office operations. P.I. Tr. 223. Salvatore DeLeva, a planner who worked with plaintiff, testified that he had had some difficulty working with plaintiff on the Master Plan because plaintiff had a greater familiarity with the plan and "expected more out of him." Tr. 218–19. Although DeLeva explained from the stand that he considered this to be an unimportant matter, he did not deny going to plaintiff's supervisor, Cassidy, with a complaint at the time of the incident. *Id.* Yvonne Tyler, who was in charge of the Model Cities clerical staff, testified that plaintiff had difficulties getting along with the clerical personnel. P.I. Tr. 215, 217. She also recounted several incidents in which she observed plaintiff using abusive or insulting language to administrative aides, including herself.[25] P.I. Tr. 219, 221.

**24.** Plaintiff seeks to explain this friction by reference to the confusion, not of her own making, regarding her proper duties in the Program. She relies on a 1971 memorandum from Administrative Assistant Bob Carty to Assistant Director Ogene in arguing that she was actually under the direction of Director James Hood and that her position under Ogene existed only on paper. *See* Plaintiff's Trial Exhibit 43a; Tr. 497–98. However, this memorandum in fact indicates that while plaintiff was performing some assignments for Hood, she remained under Ogene's supervision. *Id.,* Tr. 582, 588–90. Plaintiff considered, and at times refers, to Mock, Odum and Ogene as "false intermediaries" despite the realities evident in the organizational structure. Tr. 422–23, 460, 503, 582. She continued in this attitude even following Hood's departure in June, 1972. *See, e. g.,* Plaintiff's Trial Exhibit 35; Tr. 397–99.

There is no evidence to indicate that either Director Hood or his administrative assistant, Bob Carty, encouraged plaintiff's recalcitrant attitude toward assignments and supervision through the normal chain of command. Rather, both the memorandum and testimony in the record concerning Hood and Carty's dealings with Ogene and Cassidy indicate that Hood and Carty attempted to work around what they considered to be a minor staffing problem. *See* P.I. Tr. 115; Tr. 25. The Court concludes from the record that plaintiff exacerbated what was originally a minor problem by unwarranted demands for special treatment and a refusal to

accept supervision through normal channels. The Court concludes that plaintiff's attitude, rather than confusion in staff responsibilities, generated most of the friction between plaintiff and her supervisors.

**25.** Plaintiff denied making several such remarks attributed to her by Tyler and explained others as being said "in jest." Tr. 375, 376, 461–62. The Court concludes that plaintiff in fact made several remarks to subordinates which would be interpreted as insulting and that these remarks were disruptive and increased office tensions.

Plaintiff also introduced testimony from several co–workers who indicated that they had had no difficulties in their relations with plaintiff. Anna Hart and Salvatore DeLeva, both of whom had shared an office with plaintiff for some time, testified that they had no personality problems with plaintiff. DeLeva noted that one must expect some problems in any office. Tr. 219. Leatrice Edwards, a clerk–typist with the Model Cities Program during plaintiff's tenure, testified that she had a good working relationship with plaintiff and that she had observed no problems between plaintiff and clerical workers. Tr. 77, 78. Finally, plaintiff introduced testimony of several former MNAB members to the effect that they had experienced no personal difficulties in working with plaintiff. Given the evidence of the different work environments encompassed by the com-

The record as a whole establishes that plaintiff had some difficulties getting along with Model Cities staff and that her supervisors were aware of this problem.

The evidence of friction between plaintiff and her supervisors and some other staff stands in marked contrast to evidence concerning Odum's relationships in the Model Cities Program. Cassidy, Ogene, and Yvonne Tyler all testified that Odum got along well with his superiors and co-workers. Plaintiff offered no evidence to dispute this testimony.

Because neither Odum nor plaintiff had significant supervisory experience, the applicants' demonstrated ability to get along with superiors, peers, and subordinates in working relationships would be particularly significant in determining how each would perform in a supervisory role. Thus, Thomas Cassidy explained that he chose Odum as Acting Chief despite Odum's lack of supervisory experience because in his view Odum had the ability to get along with people. Tr. 597. In contrast, both Cassidy and Ogene viewed plaintiff as a disruptive influence within the staff, see, e. g., Tr. 580, and defendant introduced evidence supporting such a view. The Court concludes that defendant produced sufficient evidence to demonstrate Odum's greater ability to get along with superiors and co-workers, as a further legitimate, nondiscriminatory rea-

son for Odum's selection over plaintiff. The Court also finds that plaintiff's evidence does not refute the evidence offered by defendant on this issue. Thus, defendant supported its general contention that Odum was better qualified than plaintiff as to two specific criteria, i. e., his better administrative experience and his greater proven ability to get along in working relationships with all Model Cities staff.

■ The burden of production thus shifted to plaintiff to prove these reasons were pretextual and that the selection of Odum was actually based on sex.[26] Plaintiff first attempted to prove that Ogene, who made essentially the final decision on the selection,[27] was biased against professional women and that this bias explained his failure to promote plaintiff. The record reveals that Ogene and plaintiff experienced a troubled and tumultuous relationship during their concurrent tenure in the Program. Each of the several employees who testified concerning this relationship commented on the serious problem between the two. However, none of these employees attributed these severe difficulties to any bias held by Ogene against women; rather, Robert Mock, Anna Hart and Sylvester Vaughns all saw the problems as a result of serious personality conflicts between the two. Tr. 18, 67, 206. Mock commented that these

munity-minded MNAB as opposed to the Model Cities Program under Ogene, the Court does not view plaintiff's working relationship with persons in the MNAB as especially relevant to the question of her ability to get along within the Program itself. Also, the fact that some of her co-workers did not experience difficulties also does not eliminate the fact that serious and disruptive incidents involving plaintiff had occurred prior to the promotion decision.

**26.** As noted *supra* at n.13, a plaintiff in a Title VII case may show pretext by reference to an employer's general policy and practice regarding minority or female employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). A plaintiff may also introduce direct evidence of discriminatory motive or facts as to the employer's prior treatment of the plaintiff. *Id.* Here plaintiff resorted to all of these tactics in attempting to show that defendant's presumptively valid reasons were pretextual.

**27.** Ogene did not have actual authority to hire or promote at the time of his promotion decision. P.I. Tr. 118; Tr. 172. He had, however, been delegated authority to consider the applicants for this position and made his recommendation to Director Hood. P.I. Tr. 118. Hood adopted his recommendation and signed the personnel action notification. Plaintiff does not claim that Hood was motivated by sex discrimination. In fact, she clearly had a special and close working relationship with Hood, and it is somewhat noteworthy that in such circumstances Hood approved the promotion of Odum in plaintiff's stead. *See* Tr. 396–97. *But see* Tr. 594. Hood did not testify at trial and the record is silent on the reasons for Hood's approval of Odum's promotion. The Court will not speculate on Hood's motives. In any case, plaintiff argues that Ogene was the selecting official in fact, and the Court has reviewed the record from such a perspective.

problems were worsened by rudeness on both parts. Tr. 18.

The record establishes that Ogene's unpleasant relationship with plaintiff was anything but unusual. Ogene's superiors and subordinates uniformly characterize him as arrogant, rigid, and holding a superior attitude to all but himself. P.I. Tr. 368; Tr. 63, 71, 182, 276. According to many reports Ogene purposely created rancor and pandemonium and was poisonous, petty, and demeaning to all around him. Tr. 34, 318. *See* P.I. Tr. 354, 366. Thus, although it is clear that Ogene and plaintiff experienced bitter and turbulent interaction, the record does not support a finding that this was due to plaintiff's sex.

Plaintiff also argues that the fact that Ogene designed an examination, or interview, for the two applicants which placed Odum at a distinct advantage over plaintiff demonstrates his discriminatory motive. One section of Ogene's exam, or interview, contained questions which only the incumbent or one equally familiar with the actual work of the position in question would be able to answer. Tr. 171. This offending section was discarded following the interview at the insistence of Lucille Johnson. P.I. Tr. 150–52; Tr. 194. It is unclear what, if any, further consideration the interview scores received in the final selection process. Tr. 382, 501, 593–94. In light of the record as a whole, the Court does not find that this interview, or exam, had a significant effect on the decision not to select plaintiff for the position.[28]

The primary importance of Ogene's actions with regard to the interview is not the effect of the interview on the selection process, but rather the fact that Ogene demonstrated that he clearly favored Odum over plaintiff for the position. Plaintiff argues that this favoritism demonstrates Ogene's bias against her as a woman. The Court cannot agree. Ogene's preference for Odum over plaintiff may be explained as easily by Ogene's dislike for plaintiff, by his belief that Odum was better qualified than plaintiff, or, in fact, by Odum's race or national origin as by plaintiff's sex.[29] Plaintiff had the burden of proving that defendant's reasons for her non–promotion were pretextual and that the non–selection was due to an illegal sexual bias. Proof of Ogene's preference for Odum, otherwise unexplained, does not suffice to meet this burden. *See Kennedy v. Landon*, 598 F.2d 337 (4 Cir. 1979).

Plaintiff also attempted to prove that Ogene held a general bias against women. The record does not, however, sustain such a conclusion. Lucille Johnson, who was Ogene's supervisor for some time following plaintiff's termination, testified that her problems with Ogene were work related and were not related to Ogene's feelings toward women. Tr. 181. Anna Hart testified that Ogene had problems dealing with people whom he felt to be inferior to him, and that she could not say that an employee's sex made a difference in Ogene's treatment of the employee. Tr. 63, 72.[30]

From the record it appears that Ogene had as much trouble with men as with women in the Model Cities Program. Rob-

**28.** Lucille Johnson testified that the department or division head was required to conduct an interview prior to the final selection. Tr. 192. Because nothing in the record indicates what use was made of the scores received on the interview questions, the Court assumes that the interview's final effect on the selection process was the mere satisfaction of this requirement. *See* Tr. 172.

**29.** Plaintiff raised no claim of discrimination on the basis of race or national origin in the instant suit and the Court declines to consider whether the record would support such a claim. The Court merely takes notice of the fact that more than one explanation exists for

Ogene's preference for Odum. Robert Mock mentioned this in his own testimony concerning Ogene's failure to promote plaintiff. Tr. 21.

**30.** Anna Hart related an incident wherein Ogene reprimanded four professional women for not staying after hours to do typing. Tr. 72. Hart noted, however, that the four women told Ogene that they were not typists and the matter ended there. This incident is inconclusive as to Ogene's attitude, particularly given his well–documented general penchant for authoritarian and arrogant conduct. *See* P.I. Tr. 368; Tr. 72.

**1004**

ert Mock, Salvatore DeLeva, and Charles Olson all testified that they had serious difficulties working with Ogene, and Mock also recounted further problems which George Timberlake experienced. Tr. 32, 43, 45, 219–20, 276, 279.[31]

Plaintiff also introduced testimony of Ogene's personnel techniques in the Program at a time considerably after plaintiff's termination, as well as testimony regarding his handling of personnel in the job he held immediately before coming to the Model Cities Program. Donna Olson, Charles Olson's wife, testified that she encountered problems working with Ogene in 1974, more than two years after plaintiff's termination. She noticed deterioration in her relationship with Ogene after she rebuffed his several attempts to socialize outside of work. Tr. 315. According to Mrs. Olson's testimony, Ogene took the rebuffs personally. In order to place this testimony in context, it is important to note that Mrs. Olson also characterized the "general atmosphere in the whole agency at that time" as "poisonous to everyone who worked there." Tr. 318. She attributed the poison to Ogene's "constant petty intriguing, his trickery and deceit, and the way he dealt with people, his demeaning manner when he dealt with professional people." Tr. 318. Mrs. Olson testified that during this time she was the only white professional woman in the agency. Thus, although Donna Olson's testimony taken as a whole again portrays Ogene as a remarkably unpleasant employer, her testimony does not permit a conclusion that Ogene's working relationships were any better with men than with women. The

problems which she described in her relationship with Ogene are consistent with Ogene's actions toward the entire office and that situation existed in an office in which she was the only white woman. Therefore, even if Donna Olson's testimony regarding a situation two years after plaintiff's departure from the program can be viewed as relevant, her observations do not aid plaintiff's case.

Similarly, plaintiff introduced testimony from Walter S. Burke, who employed Ogene as Deputy Director of the National Youth Corps for the four months prior to Ogene's arrival at the Model Cities Program. Burke testified that Ogene had "the idea that whatever he said was right and there could not be objections to it without a hassle." Tr. 329. The testimony at trial continued as follows:

Q. Did you observe his attitude toward women?

A. Well, that was a special field. For some reason, I noticed that he was critical of the work that women did.

THE COURT: He was critical of everybody, wasn't he?

THE WITNESS: Well, yes. To be honest about it, he had the British attitude of being superior because of position and not because of competence or knowledge.

Tr. 329. Burke attributed Ogene's criticism of the women's work to Ogene's dictatorial attitude. Tr. 330. Burke also recalled problems which five white women had obtaining annual leave at the same time as their husbands. Burke stated that Ogene

---

**31.** Charles Olson testified that Ogene had a caste system in which preferential treatment was given to black women and men, and then white men, and lastly white women. Tr. 279. The only support which he offered for this opinion was that he observed that some black women received preferential treatment from Ogene, and that Ogene appeared to disfavor white males. Tr. 296, 280. Olson's observations do not permit a conclusion that Ogene held any bias against women, although they do support a finding that Ogene had problems dealing with a variety of groups.

The evidence shows that Ogene had tremendous difficulties in dealing with people general-

ly in working relationships. Plaintiff, however, did not introduce probative evidence which showed that women did not receive promotions from Ogene as quickly as men, or were disadvantaged in any other discernable way. See discussion infra. The Court cannot conclude that Ogene's difficulties in dealing with plaintiff or with other women in the Model Cities Program evidenced discriminatory motive, where he was shown to have had as serious difficulties with male employees, and where no discernable disadvantage to women was shown. In such circumstances, Ogene's difficulties with plaintiff are inconclusive at best on the issue of discriminatory motive.

"seemed not to want to consider [the women's desire to take leave with their husbands] and he doled out vacation periods based upon his own discretion." *Id.*

The whole of Burke's testimony indicates that Ogene's problems with his staff were due to his overbearing and authoritarian nature. He characterizes Ogene's conduct as his deputy as follows:

[H]e was a very strict disciplinarian. It was difficult to please him. He frequently found opportunities to criticize the work of all of his subordinates . . . .

Tr. 328. From the testimony it appears that Ogene had both men and women subordinates while serving in this position. The Court therefore concludes that Burke's testimony about Ogene's treatment of women does not demonstrate discriminatory intent. That testimony, taken in context, does not show that Ogene gave different treatment to women than to his staff generally. Burke's testimony merely demonstrates that Ogene had serious difficulties performing as a supervisor.

Plaintiff also introduced observations from Robert Mock and Salvatore DeLeva concerning the status of professional women under Ogene. This evidence is also unhelpful to the plaintiff's case. Thus, although Mock expressed an opinion that Ogene would never promote a woman above a grade 27, he based that opinion solely on Ogene's failure to promote plaintiff to the subject position, noting that this instance represented the only opportunity Ogene had to make such a grade 30 promotion during Mock's tenure. Tr. 19–20. This one instance hardly demonstrates the general bias claimed by Mock. Salvatore DeLeva expressed an opinion that Ogene had only hired one professional woman during DeLeva's tenure. Tr. 221. On cross–examination, however, DeLeva recalled that six professional women were hired during his tenure. Tr. 222–23. Ogene testified at the preliminary injunction hearing that prior to his arrival, the Model Cities Program employed six male professionals and one female professional (plaintiff) and that as of October, 1972 the program had grown to twenty–two male and fifteen female professionals. P.I. Tr. 137–38. Plaintiff offered no evidence, other than DeLeva's self–contradictory testimony, to dispute Ogene's figures. The record reflects that Ogene had a significant part in these hiring decisions. The Court therefore concludes that DeLeva was incorrect in his recollection that Ogene failed to hire women professionals. In addition, although DeLeva speculated that women professionals were not promoted after they were hired, he offered no substantiation for this suggestion. *See* Tr. 226. Thus, Mock's and DeLeva's observations concerning the status of women in the Model Cities Program do not show a discriminatory pattern in hiring or promotion policies of the defendant.

Finally, plaintiff introduced two studies prepared by outside groups relating to the status of women employed in Prince George's County during the relevant time frame. *See* Plaintiff's Trial Exhibit 1 (Prince George's County Executive Task Force Survey on Minority Employment and Program for Equal Opportunity, issued March 1, 1972); Plaintiff's Trial Exhibit 2 (Report by the Ad Hoc Committee to Study the Status of Women in Prince George's County, issued July 1, 1972).[32]

---

**32.** Only page 9 of the study represented by Plaintiff's Trial Exhibit 2 was admitted into evidence. That page contains certain figures concerning women employed in Prince George's County but does not contain any information regarding the Model Cities Program. These data were apparently drawn from the study represented by Plaintiff's Trial Exhibit 1 and will be addressed in the discussion pertaining to the data in that exhibit.

Plaintiff also introduced data concerning the relative grade and promotion of women as compared to men in the Model Cities Program.

Plaintiff's Trial Exhibits 46, 51, 57. These data relate, however, to the employment situation in the Model Cities Program during and after May, 1973, a full year after defendant's decision with regard to plaintiff's promotion. The persons who testified concerning these studies had no independent recollection of hiring or promotion practices regarding women in the Model Cities Program during the relevant time period. *See, e. g.,* Tr. 164–65. Another expert offered by plaintiff also lacked knowledge of that employment situation during any relevant time and offered no significant additional evi-

■ Statistical evidence can be helpful in proving pretext in a disparate treatment case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 805, 93 S.Ct. at 1825. In such a case, however, the statistical evidence must compare defendant's work force to a work force of similar qualifications. *EEOC v. Sheet Metal Workers Int'l Ass'n Local 122*, 463 F.Supp. 388, 399 (D.Md.1978). *See Davis v. Califano*, 613 F.2d 957, 963–64 (D.C.Cir.1979). Plaintiff has the burden of showing that the work force to which defendant's work force is compared is qualified. *Id.* The Court finds that plaintiff has failed to meet this burden.

The study represented by Plaintiff's Trial Exhibit 1 contains employment data describing the number of women employed in broad classifications of positions within various state and county agencies in Prince George's County. The study reports that within the Model Cities Program there were no women employed in "high–level" positions, ten in "mid–level" positions, and twenty–one in "low–level" positions. Plaintiff's Trial Exhibit 1 at 61. There were a total of five "high–level" positions, nineteen "mid–level" positions, and thirty–six "low–level" positions in the Model Cities Program. *Id.* at 11. The testimony regarding this exhibit supplied no additional relevant information. *See, e. g.,* Tr. 90, 154, 175–77, 234–41, 246–63.[33] Plaintiff appears to contend that the fact that none of the five "high–level" positions was occupied by a woman supports a finding that defendant engaged in discriminatory promotion or hiring and that the Court can therefore infer that the reasons offered for the failure to promote her were pretextual. The Court cannot agree.

Plaintiff introduced no evidence which would establish what the relevant labor market would be for "high–level" positions in the Model Cities Program. *Compare Davis v. Califano*, 613 F.2d at 963. Although the Court has been supplied with some information on the number of women in other "high–level" positions in the County's employ, it is clear that the County employment figures do not represent the relevant labor market. For example, plaintiff argues strenuously that the County employment figures offer further evidence of defendant's discriminatory practices in the hiring and promotion of women, and, consequently, the Court assumes that she does not consider the County to be the labor market to which Model Cities employment figures should be compared. *See, e.g.,* Memorandum of Plaintiff at 7.

The record itself also establishes that County employment is not the relevant labor market for filling "high–level" positions in the Model Cities Program. Testimony demonstrates that such positions were filled both by promotion from within the County and from the outside. *See, e. g.,* Tr. 222–23; P.I. Tr. 427. Although the evidence does not suggest what ratio existed between these two sources for such employees, it is clear that a significant portion and perhaps a majority of the positions were filled by hires from outside the County's employment. *Id.* Therefore the County employment figures do not represent the relevant labor market. No other evidence exists on this issue and therefore the Court has no work force with which to compare the Model Cities employment figures.

Even if the Court could treat County employment figures as the relevant labor market, further difficulties prevent the use of the data provided to draw the requested inference. Plaintiff not only had the bur-

---

dence. Tr. 338–52. The discovery process was available to plaintiff for the purpose of developing data on rate of promotion during the relevant time frame. No such information was introduced. The Court concludes that the information contained in Plaintiff's Trial Exhibits 46, 51 and 57 and the testimony relating thereto are irrelevant to the issues in this case.

**33.** The relevance of the data in Plaintiff's Trial Exhibit 1 is subject to some question because it reports defendant's employment figures prior to March 24, 1972, the date on which Title VII became applicable to municipal corporations. The Court need not resolve this question because plaintiff failed to supply the Court with the additional information which would permit the Court to draw legally significant inferences from the data.

den of showing what the relevant labor market was, but that the relevant work force was similarly qualified to the one at issue. Here the work force at issue was the Model Cities Program work force.[34] Therefore, plaintiff was required to compare that work force to one similarly qualified. Neither the study represented by Plaintiff's Trial Exhibit 1 nor the record as a whole establishes what qualifications would identify a woman as qualified for "high–level" positions in the Model Cities Program as reported in the study. The study itself does not refer to either grade or the position performed in dividing positions into the "high," "mid," and "low" levels reported. In fact, testimony from the director of the study clearly demonstrated that there is no discernible objective line of demarcation between the three levels, and that the division was made by subjective impressions not fully articulated on the record. Tr. 249–51. The Court was given no information which would permit it to find that persons in "high–level" positions in the County generally were qualified to perform "high–level" positions in the Model Cities Program. In fact, testimony indicates that a physician would have been considered a "high–level" employee in the County, Tr. 260, while, to the Court's knowledge, unqualified to perform the "high–level" positions in the Model Cities Program. Moreover, although there are only five positions in the Model Cities Program classified as "high–level," the Court is left to guess what these positions were. The Court cannot in such circumstances have any way of knowing what qualifications a work force similarly qualified to the work force holding the "high–level" positions in the Model Cities Program would have. Thus, plaintiff has failed to provide the Court with information which would permit the Court to identify the relevant labor market or to discern whether any arguably relevant labor market was similarly qualified to persons holding "high–level" positions in either the Model Cities Program or in the County generally.

Despite repeated requests from the Court, plaintiff also failed to indicate the number of openings which occurred in the Model Cities Program at the relevant grades of 30 and above during any relevant time frame. Plaintiff also failed to produce any evidence to show how many qualified women either applied, or were available in any relevant labor market, for positions at grade 30 or higher in the Model Cities Program during the relevant time period. *See* Tr. 170–71. Therefore, while defendant stipulated that there had been no women employed in the Model Cities Program at or above a grade 30 as of plaintiff's termination, and this study represented by Plaintiff's Trial Exhibit 1 shows that no women were employed in the Program in "high–level" positions during a point in time immediately prior to the promotion decision here in question, the Court was not provided with the further information necessary to permit the inference sought by plaintiff as to this specific showing regarding persons employed in the Model Cities Program.

The Court concludes that plaintiff, by supplying only raw data on employment in the County and within the Model Cities Program, without also supplying the additional information which would permit the Court to identify the relevant qualified labor market, failed to provide sufficient information to permit the Court to draw the requested inferences. The data on the number of women in "high–level" positions in the Model Cities Program or in the County generally does not itself create any inference of a discriminatory practice in promotion or hiring. Plaintiff similarly failed to supply the Court with information on the number of qualified women who existed to fill the slots in question and on the number of openings in these positions during any relevant time frame. In these circumstances the Court concludes that plaintiff's statistics do not aid plaintiff's rebuttal case.

In summary, the Court finds that neither plaintiff's evidence regarding Ogene's moti-

**34.** If, indeed, the work force at issue was that of the entire County, as plaintiff appears to argue in her brief, then the Court is at a complete loss as to what work force it is to compare the County figures.

vation nor her evidence regarding the general status of women in defendant's employ was sufficient to prove that the legitimate, nondiscriminatory reasons which defendant advanced for the failure to promote plaintiff were a pretext. Plaintiff thus failed to meet her burden of proof and cannot prevail upon this claim.[35]

*Retaliation Claim*

 Plaintiff also charges that her termination was in retaliation for her filing a discrimination complaint with the County Attorney in violation of 42 U.S.C. § 2000e–3. In order to establish a prima facie case of retaliation, an employee must show that he or she engaged in protected activities, that he or she was discharged or suffered other adverse action from an employer, that the employer was aware of the protected activities, and that there was a causal connection between the protected activity and the discharge or other adverse action: *See, e. g., Hochstadt v. Worcester Foundation For Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.1976), aff'd, 545 F.2d 222 (1 Cir. 1976). A plaintiff need not establish the validity of the original complaint in order to establish a prima facie case of retaliation for having made the original charge. *United States v. University of Maryland*, 438 F.Supp. 742, 758 (D. Md. 1977).

 Uncontroverted evidence establishes that plaintiff filed a discrimination complaint with the County Attorney on July 1, 1972 and that she testified in furtherance of that complaint on October 5, 1972. Defendant urged at trial that these activities did not constitute activities protected by 42 U.S.C. § 2000e–3, and that plaintiff therefore failed to make out the first element in her prima facie case.

Title VII prohibits discrimination against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, *proceeding*, or hearing *under this subchapter.*" 42 U.S.C. § 2000e–3 (emphasis added). Defendant argues that plaintiff's participation in a local administrative proceeding does not constitute participation in a "proceeding . . . under this subchapter."

42 U.S.C. § 2000e–5(c) requires that federal claimants institute proceedings under any available state or local law prior to commencing an action with the Equal Employment Opportunity Commission. Section 13–109 of the Prince George's County Government Merit System Ordinance provides that "[a]n applicant or employee who has reason to believe that he has been discriminated against shall file his complaint with the County Attorney." Plaintiff, a county employee, followed this procedure, thus complying with 42 U.S.C. § 2000e–5(c) as well as with the procedures specified in the Merit System Ordinance.

By the provisions of 42 U.S.C. § 2000e–5(c) Congress created a system which encouraged deferral to state and local remedies. This intent is accomplished by requiring a federal claimant to initiate state or local proceedings prior to commencing a federal action. Under defendant's construction of the statute, however, Congress would offer no protection against an employer's retaliation for an employee's filing of state and/or local actions, even though an employee must file such a state or local action in order to pursue claims under the federal statute. The Court must determine whether in the context of the overall statutory scheme Congress intended the phrase "proceeding . . . under this subchapter" in 42 U.S.C. § 2000e–3 to include state or local proceedings which the employee filed in compliance with 42 U.S.C. § 2000e–5(c).

The Supreme Court recently addressed a closely related issue of statutory construction in *New York Gas Light Club, Inc. v. Carey*, 447 U.S. 54, 56–57, 100 S.Ct. 2024, 2027, 64 L.Ed.2d 723 (1980). The issue be-

---

**35.** Plaintiff also claimed that defendant's failure to act upon her request for a position audit was due to her sex. Plaintiff made this request on September 12, 1972. Ogene's memorandum notifying her of termination charges was received by plaintiff on October 6, 1972. The Court concludes that defendant's failure to act on her position audit request was due to the filing of these charges and not to plaintiff's sex. *See* Tr. 367.

fore the Supreme Court in that case was whether a prevailing party was entitled to attorney's fees "for legal services performed in prosecuting an employment discrimination claim in *state* administrative and judicial proceedings that Title VII requires federal claimants to invoke." 100 S.Ct. at 2027 (emphasis in original). The statutory section under consideration provided: *"In any action or proceeding under this title* the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 2000e–5(k) (emphasis added).

The Supreme Court noted the fact that the statute created the above–mentioned system of deferral to state and local remedies and also that the statute used the term "proceeding" in 42 U.S.C. § 2000e–5(c) to refer to state and local remedies. The Court then stated:

> Indeed, throughout Title VII the word "proceeding," or its plural form, is used to refer to all the different types of proceedings in which the statute is enforced, state and federal, administrative and judicial. [Footnote omitted.] The conclusion that fees are authorized for work done at the state and local levels is inescapable.

100 S.Ct. at 2028.

The Supreme Court thus concluded that the phrase "any . . . proceeding under this title" in § 2000e–5(k) included state administrative and judicial proceedings. A review of the statute's language convinces this Court that the similar phrase "proceeding . . . under this subtitle" in § 2000e–3 also includes state or local proceedings instituted in compliance with § 2000e–5(c). Such a conclusion makes sense given the statute's system of deferral to state and local remedies, and also furthers the purpose of § 2000e–3; that is, the deterrence of

retaliation by employers for employees' actions opposing discriminatory practices. Therefore, this Court holds that plaintiff's actions in filing a complaint with and testifying before the County Attorney constitute protected activity under § 2000e–3. Plaintiff thus has established the first element of her prima facie case.

Plaintiff further established that she received notice of termination with charges supporting such action on October 6, 1972 and that she was terminated on October 27, 1972. Therefore she met the second element of her prima facie case.

Plaintiff was also required to produce evidence from which a Court could infer that defendant knew that plaintiff had engaged in the protected activity. *See, e. g., Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. at 324. Testimony indicates that in the first few days of October, 1972 Ogene recommended to Director Clodus Smith [36] that plaintiff be terminated. Tr. 579. Clodus Smith asked Ogene to prepare the letter of termination. *Id.* Odum, plaintiff's immediate supervisor, was consulted regarding, and concurred in, the decision to terminate plaintiff and supplied charges, but did not initiate the action. P.I. Tr. 258, 262. Thomas Cassidy, then an administrative assistant to Director Smith, also helped to prepare the charges, although there is also no evidence to indicate that Cassidy participated in the initial decision to terminate plaintiff.[37]

Ogene testified that he was not aware of the fact that plaintiff had filed a discrimination complaint at the time he presented plaintiff with the termination charges against her. P.I. Tr. 98. However, Cassidy, when confronted with his prior testimony before the Personnel Board, testified that he might have known that plaintiff had filed a discrimination complaint as early as

---

**36.** James Hood resigned as Director on June 30, 1972. Clodus Smith assumed the duties of the Director in mid–August, 1972.

**37.** Charles Buehler, who sat on the Personnel Board during the hearings on this matter, testified at trial that he had the impression from testimony at the Personnel Board hearings that

Cassidy was "sparkplugging" the decision to terminate plaintiff. Tr. 112. Buehler could recall no evidence to substantiate this impression, however, and no other evidence suggests that Cassidy was involved in the original decision to terminate plaintiff.

September 19, 1972. Tr. 594. Cassidy insisted, even in the face of prior inconsistent testimony at the Personnel Board hearings, that he had not discussed plaintiff's complaint with Ogene until after the County Attorney issued his opinion in December, 1972. However, the Court finds it highly improbable, given the evidence in the record concerning the prior interaction between Cassidy and Ogene, that Cassidy would not have discussed plaintiff's complaint with Ogene as soon as Cassidy obtained this information. Therefore the Court finds that plaintiff produced sufficient evidence to permit the Court to infer that Ogene, the person responsible for initiating plaintiff's termination, was aware of her activities prior to October 6, 1972.

Plaintiff was also required to show a causal connection between her protected activities and her discharge. Absent other evidence tending to establish a retaliatory motivation, a plaintiff may meet this burden by showing that an adverse action followed her protected activities within such a period of time that the Court could infer retaliatory motivation. The evidence strongly suggests that Ogene knew that plaintiff had filed a complaint as of some-

time in mid or late September, 1972. Ogene initiated procedures to terminate plaintiff in early October, 1972. The Court finds that this sequence of events permits the Court to infer retaliatory motivation.[38] Therefore, the Court finds that plaintiff met her burden as to a prima facie case, and that the burden shifted to defendant to articulate legitimate, nondiscriminatory reasons for the decision to terminate plaintiff. The Court further notes that

> Title VII tolerates no discrimination for participation in protected activities. Thus, if it is shown that retaliatory discrimination on the part of the employer contributed among other reasons to cause the discharge, there is a violation of the statute. *See Bradington v. International Business Machines Corp., supra.*

*Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. at 324.

In the memorandum which accompanied plaintiff's notice of termination, Ogene advanced several reasons for the decision to terminate plaintiff. These reasons were (1) insubordination and unsatisfactory performance, (2) absence without leave, (3) knowingly giving false statements to super-

---

**38.** Plaintiff argues that even more striking evidence of defendant's retaliatory motivation can be found in the fact that defendant served plaintiff with her notice of termination one day after plaintiff testified before the County Attorney in furtherance of her complaint. The evidence indicates that Ogene went to the Director to recommend plaintiff's termination several days prior to October 5, 1972, the date on which plaintiff testified. Cassidy testified that after Director Smith asked Ogene to prepare a letter of termination for plaintiff, Ogene proceeded to gather documents which he felt would support various termination charges. Tr. 580. The original transmittal memorandum, dated October 2, 1972, was addressed to be sent from Clodus R. Smith. Dr. Smith had the address portion changed so that the transmittal of the termination notice went from Obi S. Ogene. Tr. 580. This altered transmittal memorandum was also dated October 2, 1972. The evidence therefore indicates that the charges were prepared well before plaintiff testified. Plaintiff introduced no evidence to show that any of her superiors knew in advance that she was planning to testify on October 5, 1972. Nor is there evidence that any superior knew that she had testified on that date. Therefore,

the fact that she received her notice of termination on October 6, 1972 does not appear to have any connection to the fact that she had testified on the previous day.

Plaintiff also appeared to suggest in her testimony at trial that retaliatory motivation could be inferred from the fact that "starting from July 1st, after my filing of charges—well the discriminatory actions taken against me almost doubled in number prior to what they were before I filed my discrimination complaint." Tr. 370. As noted *supra*, plaintiff filed her complaint with the County Attorney on July 1, 1972. There is absolutely no evidence in the record to suggest that any of plaintiff's superiors knew of this complaint at any time earlier than mid–September, 1972. In addition, the Court has reviewed the several incidents involving plaintiff during the period from July through September, 1972 and concludes that these incidents had independent causes established in the record. These incidents are discussed more fully *infra*. The Court therefore does not agree with plaintiff that the mere frequency of unpleasant incidents subsequent to July 1, 1972 supports an inference of retaliatory motive.

visor, (4) violation of county ordinances, administrative regulations, and department rules, and (5) consistent offensive conduct to superiors and other Model Cities staff. At trial defendant attempted to produce evidence to support several of these reasons. There is no support in the record, however, for Ogene's charges numbered (2), (3) and (4) above.

Plaintiff's payroll records, which were introduced as Plaintiff's Trial Exhibits 33 and 37, give no indication that plaintiff was absent without leave in violation of Merit System Ordinance § 13–133. Plaintiff did take leave without pay on several occasions, but this action is not subject to discipline under the ordinance. Both testimony at trial and a review of Plaintiff's Trial Exhibit 38 suggest that Ogene may have altered plaintiff's records to show "absence without leave" in place of entries indicating "leave without pay." Tr. 309–10.

In addition, the "false" statements which Ogene charges that plaintiff made to her supervisor were merely suggestions made by plaintiff to Director Smith concerning office procedures. These statements were not factual assertions, and while it is clear that they disturbed Ogene greatly, undoubtedly because they reflected plaintiff's criticism of Ogene's questionable office administration techniques, the statements were not "false." Thus, the Court finds that the charges numbered (2) and (3) above lack evidentiary support sufficient to permit the Court to view these as legitimate, nondiscriminatory reasons for plaintiff's dismissal.

Ogene also charged that plaintiff ignored the procedures specified in Ogene's March 19, 1971 memorandum establishing internal operating practices for the Model Cities staff. Ogene's complaints were that plaintiff did not follow the grievance procedures set forth in the memorandum and that plaintiff had "consistently" transmitted official documents and correspondence outside proper channels. The Personnel Board found that the grievance procedures established by Ogene in the memorandum entitled Internal Operating Practices were contrary to the County's Merit System Ordinance and violative of due process. Plaintiff's Trial Exhibit 17. The Board further found evidence of only one incident where plaintiff had improperly routed official documents and therefore found that the charge of "consistent" misrouting was unsupported. *Id.*

Although the Prince George's County Circuit Court reversed the decision of the Personnel Board, essentially on jurisdictional grounds, it did not question the Personnel Board's findings on this issue. *See* Defendant's Trial Exhibit 1. Further, defendant did not press this ground at trial in this Court. Therefore, after a review of the record, this Court agrees with the Personnel Board that Ogene's fourth charge does not state a sufficient reason for plaintiff's termination.[39]

Nevertheless, the Court finds that the first and fifth charges contained in Ogene's notice of termination do articulate legitimate, nondiscriminatory reasons for the decision to discharge plaintiff and that these reasons are supported by evidence in the record. Ogene's first charge is that plaintiff was insubordinate and was performing in an unsatisfactory manner. The evidence at trial establishes that during September, 1972 plaintiff refused to supply an updated copy of her employment application form, although plaintiff estimated that this task would have only taken two hours to perform. The application forms were needed by an independent organization studying the Model Cities Program. Despite several direct requests from her superiors over a period of days that she complete such a

---

**39.** There is evidence in the record to indicate that plaintiff improperly took "civil leave" on one occasion. Plaintiff took civil leave to apply for a Virginia driver's license. Although plaintiff's testimony clearly shows that she believed that this activity was compensable as "civil leave," the relevant ordinance specifies that such leave is available only where the employee is subpoenaed, or for voting or emergency national defense work. Merit System Ordinance § 13–130. Therefore plaintiff did violate a county ordinance by denoting her absence as compensated "civil leave."

**1012**

form, plaintiff chose to work on a major funding application which she decided took precedence over her superiors' requests.[40] Tr. 511–14. She was the employee who failed to supply such a form. The Personnel Board found that plaintiff's failure to comply with her superiors' direct request constituted "an act of insubordination and failure to carry out a reasonable, direct order." Plaintiff's Trial Exhibit 17 at 7.[41] After a review of the entire record this Court concludes that it is in agreement with the Personnel Board's finding that plaintiff's refusal to complete the application form constituted an act of insubordination.

The evidence also shows that plaintiff failed to meet a series of deadlines established by her superior, Odum, with regard to an assignment within her area of responsibility. Plaintiff was to provide an update as to neighborhood conditions and to prepare a statement of objectives and strategies on housing, physical environment and transportation for the Third Action Year Plan. The deadline which Odum set for the completion of this assignment was September 14, 1972. The Personnel Board made the following findings:

■ By memorandum of September 15, 1972, Mr. Odum requested members of the Planning Staff to submit the August 22 assignment by close of business September 15, 1972.

■ [Plaintiff] did not respond to this directive.

■ By memorandum of September 27, 1972, Mr. Odum queried [plaintiff] as to an explanation for "not performing this crucial task" and requested reply by the close of business, September 28, 1972.

■ As of the date of charge, October 2, 1972, [plaintiff] had not responded to Mr. Odum's September 27, 1972 memorandum.

■ During the subject period [plaintiff] was responsible for a multi–service application which . . . HUD had required to be filed at the end of September, 1972.

Plaintiff's Trial Exhibit 17 at 6.

The evidence at trial established that plaintiff failed to complete Odum's August 22, 1972 assignment by the date of her notice of termination. Although the Personnel Board found that a memorandum which plaintiff submitted to Odum on August 21, 1972 "significantly anticipated" Odum's August 22, 1972 assignment, the facts as developed at trial demonstrate that plaintiff's August 21, 1972 memorandum was a late response to an assignment which Odum had made on June 22, 1972, in which he requested that plaintiff update data from the Second Action Year Plan in her program areas (housing, physical environment and transportation); the deadline for this update had been set as July 14, 1972. Plaintiff's memorandum of August 21, 1972 identified the sources of information which would provide the necessary updated data and gave some brief statements of objectives. Odum in fact viewed this memo as unresponsive to his June assignment, because plaintiff did not actually supply the information requested. There is no evidence that plaintiff ever provided Odum with the more detailed program objectives or strategies requested by Odum's August 22, 1972 assignment. The record supports

**40.** Plaintiff explained that she had only one month earlier submitted an updated application in connection with her application for the Chief of Planning and Evaluation position. She asked that an administrative aide simply copy that application form from her personnel file. That form had been submitted in April, several months prior to the request at issue here. Plaintiff was informed that her previously submitted form was not available, and her superiors renewed their request for a form. P.I. Tr. 60. She testified that compliance with her superiors' repeated requests would have taken two hours, and that she decided not to take the time to fill out an application because she

thought that this action would impede her efforts to complete a funding application by its September 30 deadline. P.I. Tr. 61, 64. There is no evidence that plaintiff ever discussed any conflict in work assignments with her supervisors.

**41.** Although the Personnel Board's action on plaintiff's retaliatory firing complaint was reversed by the circuit court, the Board's findings with respect to Ogene's charges were sustained and, in fact, formed the basis for the circuit court's decision that defendant had not engaged in a retaliatory firing.

the Personnel Board's finding that plaintiff ignored Odum's August 22, 1972 assignment:

> exercising totally independent action in setting the priority of her work assignments in relation to the subject assignment versus continuing work on the Multi–Service Center application, without consultation with her superior.

Plaintiff's Trial Exhibit 17 at 6.

This was not the first instance in which plaintiff refused or failed to complete a superior's assignments because of her own independent decision as to the priority of her various assignments. *See, e. g.*, P.I. Tr. 70, 77, 259; Tr. 460. *See also* Defendant's Trial Exhibit 4, Attachments 15, 18. Evidence at trial also indicated that plaintiff essentially refused to comply with various established operating procedures regarding signatures on leave and time sheets and a prior authorization for long–distance telephone calls. The Court concludes that defendant produced sufficient evidence to support its charges of insubordination and unsatisfactory performance as legitimate, nondiscriminatory reasons for plaintiff's dismissal.

Ogene's fifth charge was that plaintiff had engaged in consistent offensive conduct to superiors and other Model Cities staff. At trial defendant introduced a significant amount of evidence demonstrating plaintiff's difficulty in dealing with her superiors, and occasionally with other Model Cities staff. *See* discussion *supra*. Witnesses related several incidents which occurred during the summer of 1972. Odum, plaintiff's superior, testified that after he discussed plaintiff's failure to comply with official procedures regarding leave slips, she tore up a leave slip and threw it in his face. P.I. Tr. 258. Plaintiff denied this. Tr. 375. During a staff meeting on August 28, 1972, plaintiff confronted Ogene concerning statements he had made regarding an assignment with which plaintiff was involved by stating, "That's a lie." Although the evidence indicates that Ogene may have been less than professional in his own behavior at the meeting, plaintiff's statement to a superior was one which could be expected to invite discipline.

Plaintiff had a history of stormy relations with the staff and her superiors. Several witnesses testified that plaintiff provoked a loud argument with a peer over his messy desk. P.I. Tr. 107–08, 223. A year prior to plaintiff's dismissal, she told an administrative assistant who attempted to inform her of the proper procedure regarding authorization for long distance telephone calls to "go screw herself." P.I. Tr. 218. Plaintiff testified that all concerned took this statement as a great joke. Tr. 375. However, Yvonne Tyler, who overheard the conversation, did not have the impression that the assistant took the comment as a jest. P.I. Tr. 218. The Court agrees with the Personnel Board's finding that this incident represented "grossly non–professional conduct" by plaintiff. *See* Plaintiff's Trial Exhibit 17 at 17. Yvonne Tyler also testified that plaintiff had made offensive remarks to her. P.I. Tr. 221.

Cassidy and Mock testified that they had complained to plaintiff or to their superiors about plaintiff's unprofessional conduct during their respective periods as her supervisor, and at trial neither was willing to retract those complaints. Tr. 51, 581. Mock also noted that plaintiff's relationship with Ogene was characterized by rudeness on both parts. Tr. 18. The record as a whole establishes that plaintiff's relations with virtually all of her supervisors as well as with some other staff were marked by great unpleasantness, much of which was of plaintiff's making. *See, e. g.*, Tr. 18, 81, 571. The Court therefore concludes that defendant also produced sufficient evidence to support its charge of consistent offensive conduct to superiors and other staff as a legitimate, nondiscriminatory reason for plaintiff's dismissal.[42]

---

**42.** At trial plaintiff denied several incidents which were related by defendant's witnesses, and the Court so indicates where such incidents are mentioned in the text, *supra*. Even giving these denials full credit, however, the Court finds that the weight of the evidence shows that plaintiff was a difficult employee, prone to contentious behavior and personal ef-

Although plaintiff argues that her termination was a sudden retaliatory response by defendant to her filing of a discrimination complaint, in fact plaintiff's problems with her superiors were of a longstanding nature. The Court refuses to infer from the mere fact that plaintiff's termination came while her discrimination complaint was still pending that defendant's reasons for dismissing plaintiff were pretextual. *See Bradington v. International Business Machines Corp.*, 360 F.Supp. 845 (D. Md.1973), *aff'd. without opinion*, 492 F.2d 1240 (4 Cir. 1974).

The Court considers the fact that Ogene made several unsupportable charges against plaintiff in his notice of termination more troubling. The evidence suggests that Ogene might even have gone to the lengths of falsifying plaintiff's time records to show several "absent without leave" entries in her records. However, plaintiff introduced no evidence to indicate that Ogene's actions with regard to plaintiff's records took place *after* the time that Ogene might have learned of plaintiff's discrimination complaint. The Court views Ogene's actions as in accord with his general personality. Ogene was shown to thrive on intrigue and deceit, and to react emotionally to any threat, real or perceived, to his authority. The Court concludes in light of the record as a whole that Ogene's great antipathy toward plaintiff might have led him to grave excess in seeking her termination, but that this antipathy was not in any way related to the fact that plaintiff filed a discrimination complaint. Therefore, the Court finds that plaintiff failed to show that defendant's reasons for her discharge were pretextual and that she therefore also failed to sustain her burden of proof on her retaliation claim.

There is no question, based on the record as a whole, that plaintiff was involved in constant interpersonal friction while in the Model Cities Program, and that this friction created a very difficult work environment. However, the evidence indicates that the hostility between plaintiff and her superiors, particularly Ogene, was the product of personality conflicts, not sex discrimination. Plaintiff herself has remarked that she received treatment different from that received by any other member of the Model Cities Program staff, including other women. *See, e. g.*, Plaintiff's Trial Exhibit 16 at 9. As Chief Judge Northrop noted in a similar factual context:

> Quite possibly, [plaintiff's] difficulties may have arisen from a personality conflict . . . . This personality conflict generated antipathy and professional incompatibility which might have made it more difficult for the plaintiff to perform. But this certainly does not translate into discrimination. An employer is not required to like his employees.

*Bradington v. International Business Machines Corp.*, 360 F.Supp. at 854.

A final judgment will be entered in accordance with this opinion.

---

frontery toward other employees and supervisors. Although the record also indicates that some of plaintiff's problems were due to Ogene's style of office administration, plaintiff's problems were by no means limited to her relationship with Ogene. The Court finds that general dissatisfaction with plaintiff's performance increased during the summer of 1972 and that her conduct toward superiors and staff contributed to this growing dissatisfaction, ultimately resulting in her dismissal.